**Margaret M. Zwisler**
Direct Dial: 202-637-1092
margaret.zwisler@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Orange County |
| Doha | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

# LATHAM&WATKINS LLP

July 10, 2014

**VIA ECF AND HAND DELIVERY**

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re:   *In re Aluminum Warehousing Antitrust Litig.*, No. 1:13-md-02481-KBF-RLE

Dear Judge Forrest:

We are writing on behalf of the London Metal Exchange to respond to plaintiffs' supplemental submissions on the pending motion to dismiss on grounds of sovereign immunity. Plaintiffs are asking this Court to indulge them by permitting them to amend their complaints to attempt to state a plausible claim that defendants, including the LME, unreasonably restrained trade through the alleged manipulation of the LME's load-out rule.  Even if plaintiffs were able to satisfy pleading standards for such a claim, however, this Court should not permit them to name the LME as a defendant, because such an amendment would be futile.  *E.g.*, *Mortimer Off Shore Servs. v. Fed. Republic of Germany*, 615 F.3d 97, 99, 113-17 (2d Cir. 2010) (affirming denial of leave to amend for futility because amendment would not cure subject matter jurisdiction deficiency under Foreign Sovereign Immunities Act).  Nothing that plaintiffs have said in their supplement submissions as to what they propose to allege changes the fact that the LME is immune from the jurisdiction of this Court under the Foreign Sovereign Immunities Act and no future amendment can cure this fatal defect.  Thus, the LME is entitled to have the claims against it dismissed *with prejudice* instead of allowing the plaintiffs to amend their complaint to continue to assert claims against the LME.[1]

The incontrovertible record evidence demonstrates that the LME is an agency or instrumentality of the government of the United Kingdom.  Plaintiffs' proposed amendments do not attempt to contradict these facts (nor is that possible) and therefore no amendment could destroy the LME's presumptive immunity under the Immunities Act.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Plaintiffs' proposed amendments also do not demonstrate how they could satisfy the commercial activities exception.

---

[1]   For this reason, the LME respectfully requests that the Court rule on the LME's immunities motion, even if the Court decides to dismiss the complaints on the merits.

**LATHAM&WATKINS**LLP

I.  **PLAINTIFFS' SUBMISSIONS DO NOT DEMONSTRATE HOW AMENDMENT WOULD ALLOW THEM TO SATISFY THE FIRST PRONG OF THE COMMERCIAL ACTIVITIES EXCEPTION**

At argument, the Court suggested that the LME's relationship with its approved warehouses was akin to a commercial franchisor/franchisee relationship, like McDonald's has with its franchisees, because the LME regulates approved warehouses through a contract. Plaintiffs have not proposed that they could amend to allege facts to support this franchisor/franchisee analogy and that is because they cannot.

First, of course, even if the Court were to construe the LME's warehouse agreement as similar to a contract between a franchisor and its franchisees, that would not help plaintiffs meet their obligation under the commercial activities exception because their claims are not "based upon" those warehouse contracts as a matter of law.[2] But more importantly, the record evidence establishes that the relationship between the LME and its approved warehouses is nothing like the commercial relationship between a franchisor and franchisee. The evidence shows, quite clearly, that the LME's warehouse agreement is an act of a regula*tor* regulating the regula*ted*.

The *Albatros* court grappled with this precise issue.[3] Albatros sought judicial review of the LME's discipline of it for breaches of the warehouse agreement. *Albatros* ¶¶ 5-8, 11. In assessing whether the LME was performing a public regulatory function when it enforced the warehouse agreement, the *Albatros* court recognized that "[t]he fact that the [LME's] powers are exercised pursuant to a contractual relationship between the LME and the warehouse is a factor telling against the performance of a public function *but it is far from decisive of the question*." *Id.* ¶ 23 (emphasis added). The court ultimately concluded that the LME was performing a public function when it enforced the warehouse agreement because the source of the LME's regulatory power was statutory not contractual; the LME's regulatory power over approved warehouses came from the Financial Services Act of 1986, not merely from the contracts. *Id.* ¶¶ 24-27. The court held that, "[w]hen engaged in the process of regulation necessary to meet the requirements of the 1986 Act, in particular those of Schedule 4 [the "Recognition Requirements"], the LME is in my judgment performing a function that can properly be said to be woven into a system of governmental control of investment business or integrated into a system of statutory regulation." *Id.* ¶ 27. Thus, the LME's relationship with approved warehouses is as a public regulator "despite the fact that [the LME] has a contractual relationship with those whom it regulates." *Id.* ¶ 27. Importantly, the court also found, that the regulation of warehouses was part of the LME's public function, and not merely directed only at the protection of the commercial interests of the LME. *Id.* ¶ 28. A determinative factor was that the LME would be in breach of the requirements of Schedule 4 if it failed properly to regulate the issue of

---

[2] Defendant the London Metal Exchange's Reply to Plaintiffs' Joint Opposition to its Motion to Dismiss All Complaints on Sovereign Immunity Grounds at 10-11 (May 23, 2014) (ECF No. 386) ("LME Reply").

[3] Declaration of Mark Bradley in support of the London Metal Exchange's Motion to Dismiss All Complaints (May 23, 2014) (ECF No. 387) ("Bradley Decl."), Ex. Q, *R v. The London Metal Exch. Ltd. ex parte Albatros Warehousing BV* (unpublished Mar. 30, 2000).

warrants. *Id.*

That the LME's agreement with approved warehouses is an act of a market regulator, and not merely a commercial franchise, is even more clear today than it was at the time of *Albatros* because the Recognition Requirements adopted in 2001 that are in force today are much broader and more specific than the Recognition Requirements that were in force in 2000 when the *Albatros* court issued its decision.[4] That is why the court in *Rusal* said that there was no dispute that the LME's load-out rule was subject to judicial review. Bradley Decl., Ex. R. Therefore it is undisputed that, when setting load-out rates, the LME is performing a *regulatory*, not commercial, activity. Thus, to find that the LME's relationship with its warehouses is a commercial activity, the Court would have to simultaneously reject the holdings of two courts in the UK who interpreted the statutory regime under which the LME is required to operate and then effectively conclude that, under that very same statutory regime, conduct that is regulatory in the UK is commercial in the U.S.

The 2001 Recognition Requirements do not merely impose obligations on the LME to regulate traders on its exchange; they also specifically require the LME to *regulate* approved warehouses. Section 4 of Part I of the Schedule to the 2001 Recognition Requirements requires the LME to "protect the orderly functions of the market" and investors on the exchange. This includes, among other things, ensuring that the LME has "satisfactory arrangements" for "the safeguarding and administration of assets belonging to users of [its] facilities" and "for securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange." Bradley Supp. Decl. Ex. D ¶¶ 4(2)(d), (g). The 1986 recognition requirements in force at the time of *Albatros* did not expressly impose any of these obligations on the LME. *Id.* ¶ 15, *compare* Ex. F, *with* Ex. D. The "assets belonging to users of [the LME's] facilities" are the metal that is stored in LME-approved warehouses that underpin the financial contracts traded on the LME. Bradley Supp. Decl. ¶ 20. And, in order to ensure "the timely discharge" "of the rights and liabilities of the parties to transactions" on the LME "by performance," the LME must ensure that users of the exchange can, if they so choose, physically settle LME futures contracts in a timely and effective manner. *Id.* ¶ 20.

The UK government imposed these regulatory obligations **directly** on the LME. The LME's obligation to regulate warehouses does not arise through a delegation of authority from the FCA; its obligation arises directly from the statute that authorizes the Recognition Requirements, and it is those that require the LME to regulate warehouses. Thus, everything that the LME does in relation to warehouses is for the sole purpose of ensuring that, when a buyer takes delivery of a warrant on the LME, he knows exactly what he is getting, and he gets it. The LME warehouse agreement is an integral part of fulfilling these regulatory obligations. Bradley Supp. Decl. ¶¶ 11-12, 18 & Ex. C; Bradley Decl. ¶¶ 43-55.

---

[4] Supplemental Declaration of Mark Bradley in support of the London Metal Exchange's Motion to Dismiss All Complaints ¶¶ 13-15, Exs. D, F. (June 10, 2014) (ECF No. 432) ("Bradley Supp. Decl.").

Hon. Katherine B. Forrest
July 10, 2014
Page 4

LATHAM&WATKINS LLP

Franchisors, like McDonald's, are not required nor empowered by a sovereign government to regulate a market; their contracts with their franchisees are not designed to fulfill statutory obligations; they do not have the power to investigate and take disciplinary action against their franchisees; and the franchisor can change the terms of its agreement without having to resort to public notice and consultation procedures and without having to be subject to judicial review.  In the UK, only entities which perform a clearly and definably *public* (regulatory) function are amenable to judicial review.  Moreover, McDonald's does not face the threat of having its ability to operate as franchisor revoked if it does not regulate its franchisees sufficiently.

## II. PLAINTIFFS' PROPOSED AMENDMENTS WOULD NOT ALLOW PLAINTIFFS TO SATISFY THE ALTERNATIVE PRONG OF THE COMMERCIAL ACTIVITIES EXCEPTION

Plaintiffs also do not propose to amend their complaints in any way to allege that their claims are "based upon" (1) an "act" that the LME engaged in outside the U.S. "in connection with a commercial activity of [the LME] elsewhere" and (2) "that act" outside the U.S. caused a "direct effect" in the U.S.  28 U.S.C. § 1605(a)(2).  First, plaintiffs do not identify an "act" outside the U.S. in connection with a commercial activity of the LME also outside the U.S.  Moreover, no matter what conduct plaintiffs propose to allege, there is no way that any such "act" outside the U.S. could possibly be held to have had a "direct effect" in the U.S. as a matter of law.  "Direct effect" has a precise legal meaning and it means that there can be **no "intervening events"** between the LME's act outside the U.S. and the direct effect in the U.S.  LME Reply at 20-21.  If, for example, plaintiffs claimed that the purported "act" outside the U.S. is the LME's setting of the load-out rules, the complaints themselves make clear that "act" alone could not and did not have a "direct effect" in the U.S.  LME Reply at 20-24.

LATHAM&WATKINS<sup>LLP</sup>

## CONCLUSION

For the foregoing reasons and the reasons set forth in the LME motion to dismiss based on sovereign immunity, the Court should dismiss all claims against the LME *with prejudice* and should not grant plaintiffs leave to amend.

    Respectfully submitted,

    /s/ Margaret M. Zwisler
    Margaret M. Zwisler (admitted *pro hac vice*)
    (*margaret.zwisler@lw.com*)
    William R. Sherman (*william.sherman@lw.com*)
    Jennifer L. Giordano (*jennifer.giordano@lw.com*)
    Jeffrey H. Newhouse (*jeffrey.newhouse@lw.com*)
    LATHAM & WATKINS LLP
    555 Eleventh Street, N.W., Suite 1000
    Washington, D.C. 20004
    Telephone: (202) 637-2200
    Facsimile: (202) 637-2201

    *Attorneys for Defendant The London Metal Exchange*

cc: All Counsel of Record (via ECF)